# United States Court of Appeals
## For the First Circuit

No. 19-1101

UNITED STATES OF AMERICA,

Appellee,

v.

HAROLD ALTVATER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Barron, Circuit Judges.

Robert L. Sheketoff for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with
whom Andrew E. Lelling, United States Attorney, was on brief, for
appellee.

March 25, 2020

**BARRON**, **Circuit Judge**. Dr. Harold Altvater was convicted in 2018 of three counts of securities fraud for insider trading, in violation of 15 U.S.C. §§ 78j(b) & 78ff(a), and 17 C.F.R. § 240.10b-5. The District Court sentenced him to eighteen months' imprisonment followed by a year of supervised release. On appeal, Altvater challenges his convictions on a number of grounds. We **affirm**.

## I.

Ariad Pharmaceuticals, Inc. ("Ariad") is a small Cambridge-based pharmaceutical company whose shares are traded on the NASDAQ exchange. Altvater's then-wife, Maureen Curran, joined Ariad in 2006 and eventually became the company's "head of pharmacovigilance and risk management."

During the time in question, Ariad was developing a new drug called Iclusig to treat chronic myeloid leukemia. Curran oversaw the collection and disclosure of data regarding Iclusig's safety and side effects as the drug underwent clinical testing. Because of Curran's role in the company, she became privy to confidential information regarding Iclusig's viability as a marketable drug. As a result, both she and her spouse fell under Ariad's insider trading policy.

Altvater had a history of trading in Ariad stock through his private brokerage accounts, but, according to Curran, in

September or October of 2013, she told Altvater to cease trading in Ariad stock because of a company-imposed blackout period. Despite this warning, over the next several months Altvater made three series of trades in Ariad stock that took place just before the public disclosure of information concerning the United States Food and Drug Administration's ("FDA") assessment of Iclusig and that drug's path toward continued use.

Altvater sat for a deposition with the United States Securities and Exchange Commission ("SEC") on July 28, 2016, during which he answered questions regarding what information about Ariad he had learned from Curran and whether that information influenced his decisions to trade in Ariad stock. About one year later, a grand jury in the District of Massachusetts indicted Altvater on three counts of federal securities fraud. Each count was based on one of the series of trades described above.

On October 9, 2018, Altvater was convicted on all three counts after a jury trial, and the District Court then sentenced him to eighteen months in prison followed by a year of supervised release. Altvater then timely filed his notice of appeal.

**II.**

Altvater first challenges the District Court's decision to admit into evidence a "substantially redacted recording" and

- 3 -

transcript of his SEC deposition.[1]  Altvater contends that this version of the deposition "offer[ed] a 'massaged' version of his statement, edited to do as much damage as possible to the defendant's position at trial that he traded on publicly available information based on his own views."  Altvater further asserts that the rule of completeness, as codified in Federal Rule of Evidence 106, required the admission of the entire deposition and thus all of the redacted portions.

Rule 106 provides that:  "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part -- or any other writing or recorded statement -- that in fairness ought to be considered at the same time." (Emphasis added).  "The rule of completeness ordinarily comes into play when a statement is offered to explain another statement that is being admitted into evidence," United States v. Verdugo, 617 F.3d 565, 579 (1st Cir. 2010), as it is meant to prevent the jury from being misled by reading or hearing a statement "out of context," Fed. R. Evid. 106 advisory committee's note to 1972 proposed rules.  As a result, the rule of completeness allows for the admission of otherwise

---

[1] Although the government was able to admit Altvater's deposition statements into evidence as admissions of a party-opponent under Federal Rule of Evidence 801(d)(2), the bar against hearsay prevented Altvater from admitting his deposition statements directly into evidence.

- 4 -

inadmissible statements only when such statements are "explanatory" or "relevant to the admitted passages." United States v. Williams, 930 F.3d 44, 58 (2d Cir. 2019) (quoting United States v. Gupta, 747 F.3d 111, 139 (2d Cir. 2014)).

We review a preserved challenge to a district court's Rule 106 determination for abuse of discretion. See United States v. Bucci, 525 F.3d 116, 133 (1st Cir. 2008); see also United States v. Houlihan, 92 F.3d 1271, 1283 (1st Cir. 1996) ("[W]hen the trial court, acting in its discretion, finds that proffered excerpts, standing on their own, are not misleading, its judgment is entitled to great respect."). We see none here.

Altvater contends that the redacted version of the deposition

> could be fairly interpreted to mean that he
> and his wife spoke on a regular basis about
> their work, that he knew she was in possession
> of material non-public information, that she
> communicated with the FDA as part of her job,
> and that she always told him it was a bad idea
> to trade in Ariad stock, including a specific
> adamant warning not to trade in late September
> or early October of 2013.

Altvater then specifies that the redacted deposition made it seem that he took advantage of conversations he had with Curran in order to trade in Ariad stock before the public dissemination of material information about Iclusig's development and viability. That being so, Altvater contends, "the main thrust of the defendant's SEC deposition was distorted" by the government's redactions, as "[a]

- 5 -

fair assessment of his [entire] deposition was that he traded based on his own idiosyncrasies, his reading of the public record[,] . . . and without any material insider information from his wife."

But, Rule 106 is not a pathway to the admission of otherwise inadmissible portions of a writing or recorded statement merely because some distinct portions of that writing or statement are admissible.  See United States v. Awon, 135 F.3d 96, 101 (1st Cir. 1998), abrogated on other grounds by United States v. Piper, 298 F.3d 47 (1st Cir. 2002).  Thus, Altvater has the burden of showing how the government's redactions created a "misunderstanding or distortion" that "[could] only be averted by the introduction of the full text of the out-of-court statement," id. (emphasis added), given that his objection was to the exclusion of all the redacted material.

Altvater fails, however, to engage in the granular level of analysis necessary to succeed on his challenge. Instead, he focuses solely on the alleged distortions caused by the redactions generally without fully analyzing why each of the redacted statements -- or even those that he identifies as being the most important -- needed to be admitted under Rule 106.  In fact, while Altvater acknowledges that there were "more than sixty full pages worth of testimony removed entirely from a hundred and sixteen page transcript, and hundreds of lines of testimony redacted on the pages which were included," he requests that all of this

redacted material be admitted without attempting to meet his burden to explain why it would be necessary to admit into evidence each and every statement contained in the redacted material to dispel some alleged distortion caused by the government's redactions. Thus, this challenge fails.  See United States v. Simonelli, 237 F.3d 19, 28 (1st Cir. 2001) (rejecting the argument that "a general attack on [a witness's] credibility" can justify the admission of all of the witness's prior consistent statements under the rule of completeness); United States v. Jackson, 180 F.3d 55, 73 (2d Cir.), on reh'g, 196 F.3d 383 (2d Cir. 1999) ("The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages.").

## III.

Altvater next challenges certain limits that the District Court placed on his ability to cross-examine Dr. Francis MacMillan, a friend of Altvater's, about the content of a telephone conversation that the two of them had regarding Ariad stock. MacMillan, whom the government called as a witness, testified that on December 12, 2013, Altvater told him over the phone "that there would be some movement in the share price" of Ariad stock. MacMillan further testified that Altvater's "tone was fairly authoritative, that he knew what he was talking about," and that

- 7 -

MacMillan suspected that Altvater's source of information was his then-wife, Curran, who MacMillan knew worked for Ariad.[2] In addition, MacMillan testified that, in reliance on Altvater's advice, he bought more shares in Ariad almost immediately after the phone call ended.

On cross-examination, Altvater's counsel asked MacMillan whether his phone conversation with Altvater also covered Iclusig's ongoing use in Europe or the fact that Europe's equivalent to the FDA had not expressed any concern about the drug's use. The government objected to this line of questioning on the ground that it sought testimony that would constitute hearsay, as Altvater's statements on those subjects would not be an admission of a party-opponent.

Altvater responded in turn that it would be unfair to admit testimony about part of the telephone conversation between Altvater and MacMillan but not "the rest of the conversation." The District Court partially agreed, as it held that, although MacMillan's recounting of Altvater's statements during that phone call would indeed constitute hearsay, it would give Altvater "some leeway" with regard to his ability to cross-examine MacMillan about

---

[2] The government's theory was that Altvater himself bought Ariad stock on December 4, 2013, after he learned through Curran that there remained strong patient demand for Iclusig even though it had been pulled from the market. This knowledge seems to be what the government alleges led Altvater to tip his friend MacMillan off to the potential buying opportunity.

- 8 -

statements Altvater made during the December telephone conversation in light of the rule of completeness concerns that Altvater had raised. Nevertheless, the District Court also ruled that Altvater could not use this leeway to recite "a laundry list of [his] statements" that he had previously made to MacMillan.

Altvater did not object to this ruling or make an offer of proof as to what testimony he would have elicited if permitted, though he did ask MacMillan whether he and Altvater "ever discuss[ed] the European market." Altvater now claims, though, that the District Court's restrictions on his cross-examination of MacMillan violated his rights under the Sixth Amendment's Confrontation Clause and Rule 106.

We note that Rule 106, by its text, does not apply to unrecorded oral statements. As such, Rule 106 could not be used to justify the admission of the unrecorded statements Altvater made to MacMillan, see Verdugo, 617 F.3d at 579, though other non-constitutional requirements might. See 21A Kenneth W. Graham, Jr., Federal Practice and Procedure § 5074.1 (2d ed. 2019). The government does not raise the point regarding the limits of Rule 106's reach, but both Altvater's Confrontation Clause and Rule 106 challenges are premised on the same assertion about the prejudicial impact that he alleges that the restrictions on his ability to cross-examine MacMillan caused. And, the government does challenge that assertion. As we agree with the government's

argument in that regard, we may bypass the dispute between the parties over the proper standard of review. Compare United States v. Berríos-Bonilla, 822 F.3d 25, 31 (1st Cir. 2016) (explaining first that "we review de novo to determine whether the defendant was afforded a reasonable opportunity to impeach adverse witnesses consistent with the Confrontation Clause. If that threshold is met, we review the specific limitation imposed by the trial court on the defendant's cross-examination for an abuse of discretion.") (internal citations, alterations, and quotations omitted), with Bucci, 525 F.3d at 133 (describing standard of review for Rule 106 rulings as abuse of discretion).

Here, as the government points out, the District Court permitted Altvater "some leeway" to elicit statements he made to MacMillan during the December 12, 2013, phone call so long as those statements could clear up any distortion of the conversation caused by the government's presentation. Indeed, Altvater's counsel went on to ask MacMillan about whether he and Altvater discussed the European market for Iclusig on that phone call, which is the line of questioning to which the government originally objected. Thus, we do not see how Altvater can show the requisite prejudice on that basis. Moreover, Altvater neither made an offer of proof below concerning any other statements that Altvater sought to admit through cross-examination of MacMillan nor identifies any such statements now on appeal. It is thus not possible for us to

determine if the District Court's decision prejudiced his defense on the basis of any such statements.  See United States v. Steinmetz, 900 F.3d 595, 602 (8th Cir. 2018), cert. denied, 139 S. Ct. 948 (2019).  Therefore, we reject his challenge on this score, too, whether it is framed in terms of the Confrontation Clause or a non-constitutional requirement.

## IV.

Altvater's third challenge is to the District Court's decision to prohibit him from entering into evidence an email exchange from November 12, 2013, between MacMillan and Altvater that concerned the FDA's decision to pull Iclusig from development despite the fact that the drug had received good reviews in The New England Journal of Medicine.  According to Altvater, "[t]he email at issue demonstrated that MacMillan held strong views independent of Dr. Altvater, and that he initiated the conversation about the possible rebound of Iclusig."  The District Court excluded the email, however, because it ruled that the email could not be admitted "in the absence of a witness."

Normally, we would review a challenge to the exclusion of evidence for abuse of discretion, see United States v. Phoeun Lang, 672 F.3d 17, 23 (1st Cir. 2012), but Altvater fails to address the District Court's determinations that the email could not be admitted without a witness, thereby waiving any challenge

- 11 -

to this basis for the District Court's ruling, see United States
v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

**V.**

We come then to the next-to-last challenge that Altvater
brings.  It concerns the testimony of his ex-wife, Maureen Curran.

During direct examination, the government asked her
whether she learned, "[a]t some point in 2014," when the two were
still married, that Altvater had traded in Ariad stock "during
2013."  She responded that she learned Altvater did indeed trade
in Ariad stock after she saw his name appear in a list from the
Financial Industry Regulatory Authority that named all of the
"people who had traded during a particular time
period" -- apparently referring to the blackout period imposed in
October of 2013.  Shortly thereafter, the government asked Curran
"[w]hat . . . it mean[t] to [her] when [she] saw his name on that
list," which Altvater objected to on relevance and undue prejudice
grounds.

At a sidebar conference, the government's counsel stated
that Curran's "reaction is very relevant to the duty of trust and
confidentiality between the spouses and is revealing she can't
remember everything that happened before, but at this point she
does have memories."  This duty of trust and confidence was a part
of the government's case, the government's counsel explained,

because the government needed to establish it as part of its theory that Curran was an "insider" under the relevant securities laws and regulations.

In response, Altvater contended that the duty of trust and confidence did not need to be proven at all. He based that argument on his contention that the duty was legally presumed to exist under SEC regulations when two people are married and living together, as Altvater and Curran were at the time of the alleged insider trading. The District Court agreed with the government and found that Curran's answer would "go[] to part of the government's burden of proof."

Over Altvater's renewed objections, Curran then testified that she "was upset" and "very angry" upon learning of Altvater's trades during the blackout period. She went on to explain that she was upset because

> this was . . . [not] an isolated incident.
> We -- we had been married for many years, and
> the relationship had a pattern to it. To me
> this . . . clearly demonstrated to me that
> my -- I wasn't important. This was my
> profession, this was my career, I've put a lot
> into it, and it's important. You know, to
> jeopardize me that way struck me as --

When later asked "whether or not this was relevant to any kind of trust you had in your husband," Curran responded that she "trusted [Altvater] to put [her] first."[3]

Altvater contends that the District Court should have excluded all of the above-referenced testimony -- including Curran's testimony about her trust in Altvater and her reaction to learning that Altvater had traded in Ariad stock during the company-imposed blackout period -- under Federal Rule of Evidence 403.[4]  We review the District Court's decision on this point for abuse of discretion.  See United States v. DiRosa, 761 F.3d 144, 154 (1st Cir. 2014).

On appeal, the government and Altvater agree that the government's theory of the case relied on a misappropriation theory of insider trading, which "outlaws trading on the basis of nonpublic information by a corporate 'outsider' in breach of a duty owed not to a trading party, but to the source of the information."  United States v. O'Hagan, 521 U.S. 642, 652-53 (1997).  Under this theory of insider trading, the government must show that there was "a breach of a 'duty of trust and confidence'

---

[3] Curran testified that she and Altvater divorced in 2017, approximately one year before Altvater's trial.

[4] Rule 403 states:  "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

- 14 -

owed by the tipper," Altvater, "to the insider," Curran. <u>United States</u> v. <u>Parigian</u>, 824 F.3d 5, 13 (1st Cir. 2016) (quoting <u>O'Hagan</u>, 521 U.S. at 653).

The government and Altvater also agree that SEC Rule 10b5-2(b)(3) provides an illustrative list of relationships in which a duty of trust and confidence exists. The rule states:

> (b) Enumerated "duties of trust or confidence." For purposes of this section, a "duty of trust or confidence" exists in the following circumstances, among others:
> . . .
> (3) Whenever a person receives or obtains material nonpublic information from his or her spouse, parent, child, or sibling; provided, however, that the person receiving or obtaining the information may demonstrate that no duty of trust or confidence existed with respect to the information, by establishing that he or she neither knew nor reasonably should have known that the person who was the source of the information expected that the person would keep the information confidential, because of the parties' history, pattern, or practice of sharing and maintaining confidences, and because there was no agreement or understanding to maintain the confidentiality of the information.

17 C.F.R. § 240.10b5-2.

The parties diverge, however, as to whether anything more than the existence of a marriage in which the spouses live together is necessary to show that a duty of trust and confidence existed between Altvater and Curran. As Altvater sees it, "[t]he test for whether a fiduciary relationship did actually exist between the insider and a defendant is . . . an objective one, it

- 15 -

has nothing to do with the subjective feelings of the insider." When the insider and defendant are married and live together, Altvater asserts, "a fiduciary duty is virtually automatic." As a result, he contends, the testimony regarding Curran's feelings about learning of Altvater's trades was of minimal relevance and, given how she described those feelings, highly prejudicial, thereby requiring its exclusion under Rule 403.

In response, the government contends that "marriage alone is not sufficient to establish a duty of trust and confidence." The government concedes that the SEC rule "creates a presumption that spouses share a duty of trust and confidence with each other," but it notes that the "presumption can be defeated by a showing that there was no agreement or understanding to maintain the confidentiality of the information based on the parties' history, pattern, or practice of sharing and maintaining confidences." For that reason, the government argues, "Curran's testimony . . . was relevant to establish that she and Altvater shared a duty of trust and confidence."

We have not yet decided whether "a marital relationship, standing alone, is insufficient to show a history, pattern, or practice of sharing confidences," United States v. Kanodia, 943 F.3d 499, 506 (1st Cir. 2019), and we need not do so here. Even assuming that the prejudicial effect of Curran's testimony substantially outweighed her testimony's probative value, a

violation of Rule 403 is still subject to harmless error review. See United States v. Dunbar, 553 F.3d 48, 59 (1st Cir. 2009) (noting that when evidence is improperly admitted under Rule 403, we review the admission to see if the "admitted evidence likely affected the outcome of trial" (quoting United States v. Tom, 330 F.3d 83, 95 (1st Cir. 2003))).[5] And, given the substantial evidence of guilt that the government put forward in this case on each count, we are confident that any error in admitting Curran's testimony did not likely affect the jury's verdict. See, e.g., United States v. Serrano-Acevedo, 892 F.3d 454, 462 (1st Cir. 2018) (refusing to reverse a conviction under harmless-error review where there was "overwhelming" evidence of the defendant's guilt).

On count one, which covered Altvater's sales of Ariad stock on October 3 and 4, 2013, the government put forward evidence showing that Altvater had access to confidential data regarding serious side effects observed in a recent Iclusig clinical trial in the days before he made those trades. Moreover, Curran testified that on October 2, 2013 -- the day before Altvater began selling off his stock -- she returned to the family home after a meeting with the FDA about Iclusig and began crying because she

---

[5] To the extent Altvater makes a pure relevance argument based on Federal Rule of Evidence 401, this same harmless-error standard would apply, and our decision would not change. See United States v. Sells, 477 F.3d 1226, 1239 (10th Cir. 2007) (applying harmless-error review after concluding that irrelevant evidence was admitted at trial).

was so upset about how poorly the meeting had gone. Ariad then announced on October 9, 2013, that it was, after consultation with the FDA, halting participation in further clinical trials of Iclusig due to the serious side effects that some patients experienced while on the drug. This news caused a precipitous drop in the value of Ariad stock, but, by selling early, Altvater saved about $75,000.

As for count two, the government showed at trial that on October 24, 2013, Curran and Ariad had another meeting with the FDA regarding Iclusig, which Curran described as "tense [and] contentious." An hour and a half after the meeting ended, Curran called Altvater on the phone, and they spoke for about six minutes. Twenty minutes after that conversation ended, Altvater sold all of the Ariad stock that he had purchased since selling all of his Ariad stock earlier that month. On October 31, 2013, Ariad announced to the public that the FDA had pulled its approval of Iclusig and that Ariad was suspending the drug's marketing. Selling on October 24, 2013, saved Altvater about $19,000.

Finally, with regard to count three, the government offered evidence showing that Altvater purchased $55,000 worth of Ariad stock on December 4, 2013, the same day that Ariad submitted its revised Risk Evaluation and Mitigation Strategy to the FDA -- the last of the paperwork needed to get Iclusig reapproved. The fact that Ariad made that submission that day was confidential

information. When asked during his deposition with the SEC why he purchased Ariad stock that day, Altvater explained that his purchase was motivated, in part, by Curran having mentioned to him that there continued to be strong demand for Iclusig from patients despite the drug's side effects. Altvater also acknowledged in that deposition that he knew that Ariad was working on bringing Iclusig back to market and that Curran was working diligently on that effort. Ariad announced to the public on December 20, 2013, that it was resuming the marketing of Iclusig with the blessing of the FDA, which caused an appreciation in the value of Ariad's stock. Altvater then sold all of his Ariad stock on January 6, 2014, making a profit of about $21,000.

In light of that strong evidence of criminal conduct, both circumstantial and direct, concerning the trades at issue in the three counts, the discrete comments from Curran that Altvater singled out for being especially prejudicial are harmless, even if they were wrongly admitted in light of Rule 403. In so concluding, we note that the District Court warned the jury in its instructions that the jury "must not be influenced by any personal likes or dislikes, prejudice, or sympathy." Given that we have a "long-standing presumption that jurors follow instructions," United States v. Spencer, 873 F.3d 1, 16 (1st Cir. 2017), we see no reason to think that, on this record, any prejudice resulting

from the admission of Curran's testimony affected the trial's outcome.

## VI.

Altvater's final contention on appeal is that the District Court erred when it refused to admit an article from <u>The New York Times</u> entitled, "Doctors Fear Losing Leukemia Drug Deemed Risky," which concerned the FDA's decision to suspend the marketing of Iclusig despite the fact that, for many patients, there was no alternative treatment available. Altvater tried to admit the article twice during the proceedings, first when cross-examining Curran and later during his case-in-chief.

During Altvater's first attempt to admit the article into evidence, his counsel was permitted to ask Curran whether her husband showed her any news articles about Iclusig after she informed him that she knew he traded during the blackout period and instructed him to get a lawyer. Curran testified that she remembered seeing three other news articles at that time but testified that she could not remember this article.

The District Court admitted into evidence the three articles Curran recalled seeing, but it declined to admit this article and others that Curran did not recollect seeing. At the end of the government's case-in-chief, Altvater again tried to

admit the article into evidence.  The District Court declined, however, to revisit its prior decision.

On appeal, Altvater argues that establishing what information was on the public record, as shown through this article, is key because "[i]f material information has been made available to investors generally, even insiders may trade" on it. But, even if the article was properly admissible, Altvater's challenge would fail because any possible error on the part of the District Court would have been harmless.  See Dunbar, 553 F.3d at 59.

The article that Altvater sought to admit into evidence was published on November 1, 2013, almost a month after the October 3 and 4, 2013, trades that constituted count one against Altvater, and about eight days after the October 24, 2013, trade that led to count two.  As a result, the information contained in the article was not public knowledge on the dates of those trades.

Nor can Altvater show that the article's exclusion likely affected the outcome of the verdict on count three.  It is true, as Altvater notes, that the article briefly mentions that "23 leukemia specialists and three patient advocacy groups" sent the FDA a letter expressing the concern about Iclusig's unavailability after the agency's October 31, 2013, decision to pull the drug from the market.  And, Ariad's chief medical officer was indeed reported to have said that Ariad "hoped to return

[Iclusig] to the market."  But, those disclosures are beside the point, as Altvater stated in his deposition with the SEC that he purchased Ariad stock on December 4, 2013, after learning from Curran that patients were expressing substantial demand for the drug, a point not mentioned in the article, and after learning from her that she was working diligently on returning the drug to market, which is distinct from the mere hopes expressed in the article.

### VII.

We **affirm** Altvater's convictions.