# United States Court of Appeals
## For the First Circuit

No. 15-2247

UNITED STATES OF AMERICA,

Appellee,

v.

RAMÓN DELGADO-PÉREZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Torruella, Lipez, and Barron,
Circuit Judges.

Edwin Edgardo León-León for appellant.
Francisco A. Besosa-Martínez, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

August 16, 2017

**BARRON, <u>Circuit Judge</u>.** Ramón Delgado-Pérez ("Delgado") pleaded guilty to being a prohibited person in knowing possession of a firearm or ammunition, in violation of 18 U.S.C. § 922(g). In doing so, however, Delgado reserved his right to challenge, on appeal, the denial of his motion to suppress certain evidence, including the loaded firearm mentioned in the indictment, found when law enforcement searched his home. He now contends that his conviction must be overturned because the District Court erred in denying that motion. We agree, and so we reverse and remand.

**I.**

Under 18 U.S.C. § 922(g), it is a crime for certain individuals "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." Section 922(g)(1) defines persons covered by this prohibition as those "who ha[ve] been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year."

On February 26, 2014, Delgado was indicted in the District of Puerto Rico for being in knowing possession of a loaded firearm, in violation of § 922(g), by virtue of his previous conviction for a crime punishable by imprisonment of a term exceeding one year. Specifically, the indictment charged Delgado with violating § 922(g) because Delgado possessed a "Sig Sauer"

-2-

pistol loaded with ten rounds of nine-millimeter caliber ammunition.

Following the indictment, Delgado pleaded not guilty. But, he later changed his plea to guilty. Prior to changing his plea, however, Delgado filed a motion to suppress evidence recovered "in violation of the U.S. Constitution and any fruits recovered thereof."

Delgado argued in his suppression motion that the search of his residence that turned up the loaded firearm referenced in the indictment violated the Fourth Amendment because he never consented to a search of his residence, the evidence seized was not in plain view, and no other exigent circumstances justified the search of the residence. The government, in its opposition to Delgado's motion, contended that the motion should be denied because Delgado voluntarily consented to the search of his residence and because, alternatively, the officers acted in good faith in undertaking the non-consensual warrantless search of his home.

A magistrate judge conducted a hearing on the suppression issue, which was held over the course of two days: October 22, 2014, and November 10, 2014. In the Magistrate Judge's report and recommendation following the hearing, the Magistrate Judge described the events that transpired as follows.

-3-

On February 20, 2014, at least a dozen law enforcement officers arrived at Delgado's residence in Puerto Rico with a New York state warrant for his arrest for trafficking cocaine through the United States mail. When the officers arrived outside Delgado's residence and announced their presence, there was initially no answer. The officers began to open a rebar gate outside the residence, at which point Delgado opened a window and told the officers, through the window, that he was home and was going to open the door. Delgado retrieved a key, came outside, opened the rebar gate for the officers and indicated to the officers that he was by himself.

Once Delgado was outside, the officers undertook a protective sweep of the residence, which, according to one officer, is their standard practice to ensure officer safety and prevent destruction of evidence. An officer also testified that, while Delgado told the officers there was no one else present in the home, the officers did not take his word and "had to verify that there was no one else in the residence who could harm them." The agents knew that Delgado was a convicted felon and drug trafficker, and that "drug trafficking goes hand in hand with weapons." There were security cameras that could permit someone inside the house to watch the movements of the officers, and the configuration of Delgado's house included an apartment on the premises and a locked rebar fence and gate outside of the house.

During the protective sweep, the officers noticed a firearm magazine on top of a dresser in a room off of an interior hallway. Once the sweep concluded, an officer asked Delgado if there were any firearms in the residence, to which Delgado responded in the affirmative and told the officer he had a firearm and provided its location -- a dresser drawer. An officer retrieved a loaded firearm -- the Sig Sauer referenced in the indictment -- from inside the dresser drawer and rendered it safe.

An officer then asked Delgado for consent to search the residence. Delgado consented to the search verbally, but he declined to sign a consent form.

The Magistrate Judge based the above-recited findings on hearing testimony provided by two United States Postal Inspection Service officers, which the Magistrate Judge determined to be credible. On the basis of "the above summarized scenario and circumstances" reflected in the officers' testimony, the Magistrate Judge concluded that the protective sweep was justified. Thus, the Magistrate Judge found that the magazine found on the dresser during the protective sweep need not be suppressed.

The Magistrate Judge also found that, based on the magazine recovered during the protective sweep, it was "reasonabl[e]" for law enforcement to "infer[] the firearm could be inside the residence and accessible to someone else inside the

house."  The Magistrate Judge thus concluded that "it was reasonable for the agents," after Delgado told them of the firearm's location, to seize it from the dresser and render it safe.

In addition, the Magistrate Judge found that, following the protective sweep, Delgado consented to the search of the full residence.  In so concluding, the Magistrate Judge determined that the two officers' mutually consistent testimony was more credible than Delgado's.  And the Magistrate Judge found that Delgado's consent was not the product of coercion.

The Magistrate Judge advised the parties that "failure to file [objections] within the specified time waives the right to appeal this order," based on local rules applicable in the District of Puerto Rico.  See D.P.R. Civ. R. 72(d).  Neither party so objected.  Several months later, the District Court adopted the Magistrate Judge's report and recommendation and denied Delgado's motion to suppress.

On June 16, 2015, Delgado pleaded guilty to violating 18 U.S.C. § 922(g).  At the change of plea hearing, the District Court recognized that Delgado was, in pleading guilty, reserving the right to appeal the denial of his motion to suppress.

The District Court sentenced Delgado to time served, ordered three years of supervised release, and ordered the forfeiture of the loaded firearm described in the indictment.  This

appeal followed.  In addition to his counsel's brief to us, in which Delgado challenged his conviction on the ground that he did not consent to "the search of his residence and its premises" following the protective sweep, Delgado also filed a pro se supplemental brief.  In his pro se supplemental brief, Delgado challenges the lawfulness of the protective sweep and contends that both the magazine and the loaded firearm must be suppressed as fruits of that unlawful sweep.[1]

## II.

Before turning to the merits of the contentions that Delgado makes on appeal, we first consider whether Delgado waived his right to make them on appeal.  And that consideration requires us to address in some detail what happened at the change of plea hearing.

## A.

The Magistrate Judge's report and recommendation warned that failure by either party to file objections to the report and recommendation "waives the right to appeal this order."  The government thus argues that, because Delgado failed to object to the report and recommendation, he waived his right to raise this challenge on appeal to the District Court's order denying his

---

[1] When we refer to arguments that Delgado makes on appeal, we account for the arguments contained both in his counsel's brief and in his pro se supplemental brief.

motion to suppress, given that the order adopts the report and recommendation.  And, as the government points out, Delgado makes no argument to the contrary in his opening brief.

Ordinarily, the government would be right that Delgado's failure to object to the report and recommendation -- followed by his failure to address that failure in his briefing to us -- would preclude his appeal.  See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986) ("[F]ailure to file within the time allowed waives the right to appeal the district court's order.").  But, here, we deal with an unusual circumstance that requires a different conclusion.

At Delgado's change-of-plea hearing, the District Court first confirmed to Delgado's attorney that "the opinion and order of the magistrate judge, and the report and recommendation, and the opinion of the [District] Court" regarding "the legal issue as to the alleged illegality of the weapon [] seized at the moment of the arrest" would be "reserved . . . for an appeal."  The District Court then told Delgado that Delgado was "reserv[ing] the right to challenge the decision of the magistrate judge . . . and the affirmance of that decision [by] the [District] Court not granting your challenge to the suppression of the weapon that was found in your residence at your arrest."  Later in the change-of-plea hearing, the District Court reiterated to Delgado four more times that Delgado had reserved the right to appeal the suppression

-8-

issue, telling him, "[Y]ou can challenge the report and recommendation of the magistrate and the Court's order affirming the report and recommendation as to the suppression of the weapon," "[Y]ou retain as a condition to the plea, the right to challenge the decision of the magistrate judge and the [District] Court as to the suppression of the weapon"; "[Y]ou retain the ability to challenge the facts relating to the suppression of the weapon"; and "You will always be able to challenge the weapon suppression issue."

The District Court then told the Assistant United States Attorney ("AUSA") that, despite Delgado pleading guilty, Delgado was "challenging the determination of the [District] Court relating to the suppression of the weapon." In response, the AUSA answered "[t]hat is correct," without elaboration. And, when asked if the government wanted the District Court to "make a further explanation of the reservation," the AUSA declined, and did not mention that Delgado failed to object to the report and recommendation. The AUSA instead made a factual clarification, relevant only to the merits of the suppression issue, about where the magazine and loaded firearm were each found.

Thus, the government never articulated to either Delgado or to the District Court, prior to Delgado entering his plea, its present position. That position, stated for the first time in the government's brief on appeal in response to Delgado's, is that

Delgado waived his right to challenge the suppression ruling by failing to object to the report and recommendation, notwithstanding that Delgado plainly pleaded guilty on the understanding, expressly shared by the District Court and seemingly accepted by the government, that Delgado could appeal the suppression ruling.

We have explained before, however, that, by failing to raise an argument that a defendant's failure to take some action below waives that defendant's right to raise an issue on appeal, the government may waive the waiver argument. See United States v. Román-Huertas, 848 F.3d 72, 76-77 (1st Cir. 2017); see also Barreto-Barreto v. United States, 551 F.3d 95, 98 (1st Cir. 2008). And we do not see why this case is not of a similar kind, given what Delgado and the District Court said at the change of plea hearing and that the government said nothing to suggest otherwise at the hearing. In fact, at the hearing the government even addressed the merits of the ruling it now contends was supposedly at that point already unchallengeable.[2] We thus proceed to the merits.

---

[2] The government does cite to two unpublished, out-of-circuit cases that have held that defendants waived the right to appeal district courts' decisions on suppression motions by not objecting to the report and recommendation filed in their respective cases. See United States v. Cagle, 314 F. App'x. 617 (4th Cir. 2009); United States v. Buckbee, 3 F. App'x. 563 (7th Cir. 2001). But Cagle simply held that a defendant waived a particular argument

-10-

**B.**

With respect to the merits of Delgado's challenge, we ordinarily "review[] a district court's legal conclusions involved in denying a motion to suppress the evidence de novo and its findings of fact for clear error." United States v. Marshall, 348 F.3d 281, 284 (1st Cir. 2003). "On a motion to suppress evidence seized on the basis of a warrantless search, the presumption favors the defendant, and it is the government's burden to demonstrate the legitimacy of the search." United States v. Winston, 444 F.3d 115, 123-24 (1st Cir. 2006).[3]

---

because he failed to object to a magistrate judge's report and recommendation, where the defendant had never been given any reason to believe that he had, in fact, preserved the issue for appeal. 314 F. App'x. at 618. Thus, Cagle does not appear to implicate the notice and fairness concerns that the record reveals are implicated here. And, while Buckbee held that the defendant had waived the right to appeal of the denial of his motion to suppress by failing to object to the magistrate judge's report and recommendation, the opinion provides no detail about the particular facts and circumstances that suggest the case concerned facts in any way analogous to our own.

[3] As we will explain, we need not reach the factual finding that Delgado contests on appeal, even assuming that, given the District Court's representations about his right to contest the factual findings in the report and recommendation on appeal, he has not waived the right to do so by failing to raise that challenge before the District Court. Cf. United States v. Lomeli, 676 F.3d 734, 738 (8th Cir. 2012) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will not result in a [wholesale] waiver of the right to appeal when the questions involved are questions of law or mixed questions of law and fact." (alteration in original) (quotation marks and citation omitted)); Jones v. Wood, 207 F.3d 557, 562 n.2 (9th Cir. 2000) ("Failure to object to a magistrate judge's recommendation waives all objections to the judge's findings of fact. However,

In evaluating the lawfulness of the various searches that took place at Delgado's residence on February 20, the fruits of which Delgado now challenges on appeal, we begin with the protective sweep. The government argues on appeal, as it did below, that the protective sweep was lawful in light of the circumstances surrounding Delgado's arrest and thus, implicitly, that none of the evidence recovered thereafter could be excluded as the illegal fruit of that sweep. We do not agree.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has long held that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585 (1980) (quotation marks and citation omitted). "Because the prophylaxis of the Fourth Amendment is at its zenith with respect to an individual's home, a warrantless search of a private residence is presumptively unreasonable unless one of a few well-delineated exceptions applies." United States v. Infante, 701 F.3d 386, 392 (1st Cir. 2012) (quotation marks and citation omitted); see also Payton, 445 U.S. at 586.

---

in this circuit, failure to object generally does not waive objections to purely legal conclusions." (citation omitted)). Thus, our only issues to resolve are ones of law.

-12-

One of those exceptions, and the one at issue with respect to the initial and indisputably non-consensual search of Delgado's residence, is the exception for protective sweeps. The Supreme Court set out the rules governing protective sweeps in Maryland v. Buie, 494 U.S. 325 (1990).

A protective sweep is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others," that "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Id. at 327.[4] Many protective sweeps take place following an arrest within a home. We have also allowed protective sweeps, however, when an arrest "occurs just outside the home," because such an arrest "can pose an equally serious threat to arresting officers as one that occurs in the home." United States v. Lawlor, 406 F.3d 37, 41 (1st Cir. 2005).

Buie instructs that a protective sweep is permissible only where there are "articulable facts which, taken together with

_____

[4] A protective sweep is distinct from the types of searches that law enforcement officers may conduct incident to an arrest, which can extend only to "the arrestee's person and the area within his immediate control." Chimel v. California, 395 U.S. 752, 763 (1969) (quotation marks omitted); see also Buie, 494 U.S. at 336 (citing Chimel, 395 U.S. 752). Delgado was arrested on his front porch, and the evidence that he seeks to suppress was found in an interior room of the home, rather than on his person or in an area within his immediate control. Thus, the parties agree that we are dealing with a protective sweep governed by the rules set forth in Buie.

-13-

the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  Buie, 494 U.S. at 334.  In applying this standard, we evaluate protective sweeps using the same standard set out in Terry v. Ohio, 392 U.S. 1 (1968): "would the facts available to the officer at the moment of the . . . search warrant a man of reasonable caution in the belief that the action taken was appropriate?"  Id. at 21-22 (quotation marks omitted); see also Buie, 494 U.S. at 334; United States v. Daoust, 916 F.2d 757, 759 (1st Cir. 1990).  "The reasonable suspicion standard is considerably less demanding than the level of proof required to support a finding of probable cause, but must be based on more than an unfounded speculation."  Winston, 444 F.3d at 118 (citation omitted).

The government relies on three of our prior cases -- Winston, Lawlor, and Martins -- in which we have upheld protective sweeps in contending that the sweep at issue here was lawful.  But, in each of those cases, the officers undertook the sweep with knowledge of facts -- not present here -- that provided them with an articulable reason to suspect that some person other than the one arrested could be present in the residence and pose a danger to officers.

In _Winston_, 444 F.3d 115, for example, we upheld a protective sweep based on several facts that gave officers reason to believe dangerous persons might be present in the defendant's residence. Specifically, the officers had particularized reason to believe that the defendant was armed and dangerous. See _id._ at 118. The defendant had also been indicted along with twenty-five others, so officers had reason to believe that he had "numerous, potentially armed and dangerous cohorts." _Id._ at 119. And, after officers initially knocked on Winston's front door, Winston's girlfriend referred them to a neighboring residence, which the officers visited before subsequently returning to Winston's residence. This deception, we found, "gave any potential occupants inside the house five minutes to conceal themselves or prepare an ambush." _Id._

In _United States_ v. _Lawlor_, 406 F.3d 37 (1st Cir. 2005), we upheld a protective sweep of a residence when an officer had received a report of a gunshot at the scene, believed that two individuals lived in the residence and that those individuals were engaged in drug-related activities, and had routinely observed individuals coming and going from the residence. See _id._ at 42. In addition, upon arriving at the residence the officer saw "drunken combatants" and "spent shotgun shells" outside. _Id._

And, similarly, in _United States_ v. _Martins_, 413 F.3d 139 (1st Cir. 2005), we upheld a protective sweep of a residence

-15-

where a number of facts gave rise to a reasonable belief that an individual posing a danger to the officers might have been inside the residence.  Id. at 151.  A shooting had just taken place within 100 yards of the residence.  Id. at 150.  One of the shooting victims -- whom officers had reason to believe was a gang member -- indicated that an associate of his was in the residence.  Id. at 150, 144.  When the officer knocked on the door of the residence and identified himself as a police officer, he heard an adult male voice from within the apartment, followed by movement and silence.  Id. at 147.  When the officer knocked a second time, a young child answered the door and stated that he was home alone, suggesting that an adult was concealing himself.  Id.

We stated that one of these factors on its own was "insufficient to meet the reasonable suspicion benchmark" required to justify a protective sweep.  Id. at 150.  But, we concluded that "[t]aking these facts in the ensemble -- the high-crime area, the shootings, their connection with the apartment, the officer's experience and knowledge anent gang behavior, the evasive action of the adult known to be present behind the door, and the seeming attempt to misinform" -- justified the protective sweep.  Id. at 151; see also, Solis-Alarcón v. United States, 662 F.3d 577, 581-82 (1st Cir. 2011) (approving protective sweep of defendant's residence when officers had evidence suggesting that a drug trafficker may have also lived in the residence); Crooker v.

-16-

Metallo, 5 F.3d 583, 584 (1st Cir. 1993) (explaining that officers were justified in conducting a protective sweep where they possessed specific facts suggesting that a particular dangerous individual was present in the home); cf. Daoust, 916 F.2d at 759 (upholding protective sweep where the officers "knew that [defendant] had a prior criminal history of violent behavior, [and] they knew he owned a handgun, which he kept in a rather unusual place in the kitchen").

Here, however, while the facts are not as egregious as they were in United States v. Paradis, 351 F.3d 21 (1st Cir. 2003), which involved a protective sweep when officers had unusually good reason to know the area swept was empty, there is no evidence that could ground the requisite reasonable suspicion comparable to that found in the cases just described. To the contrary, United States Postal Inspector Eliezer Julián's testimony indicates that the officers did "a lot of 'intel' work" before the arrest, which involved "do[ing] surveillance" and gathering "all the information available," to "make sure that [law enforcement officers] kn[e]w exactly where [they were] going" and to ensure that the execution of the arrest was "as safe as possible." Yet there is no indication in the testimony that the pre-arrest "intel work" resulted in any evidence that another person might be present in the home at the time of the arrest, let alone that another dangerous person would be.

-17-

And, unlike in Lawlor or Martins, the record contains no evidence of violence at or near Delgado's apartment. In addition, unlike in Winston or Daoust, the record contains no evidence that officers had particularized reason to think that Delgado was armed and dangerous, beyond the general fact that his alleged offense involved drug trafficking.[5] Similarly unlike in Winston, Lawlor, or Solis-Alarcón, the record does not contain particularized evidence that could have led the officers to believe that multiple persons would have been present in Delgado's residence.

In attempting to explain why the information the government did have, prior to the sweep, justified the sweep, the government points to the following facts found in the report and recommendation: the officers believed there to be a general relationship between drug trafficking and firearms, and knew that Delgado was being arrested for a drug trafficking charge; the officers observed that the building which contained Delgado's residence included an adjoining apartment; and the officers observed that Delgado's residence was protected by a rebar fence

---

[5] We note that at least one circuit has found that this factor is not relevant to the protective sweep inquiry. See United States v. Archibald, 589 F.3d 289, 299 (6th Cir. 2009) ("[A] defendant's own dangerousness is not relevant in determining whether the arresting officers reasonably believed that someone else inside the house might pose a danger to them." (quotation marks and citation omitted)). Because we find that the record contains no particularized evidence of Delgado's dangerousness, we need not reach the question of whether an arrestee's own dangerousness could be a factor in the protective sweep analysis.

and gate and had visible security cameras, thus potentially allowing officers' movements to be tracked by someone inside the house. The government adds that Delgado's immediate voluntary surrender outside the residence could have allowed the officers to infer that "others were hiding [inside the house] waiting to . . . launch a surprise attack on the agents."

We are not persuaded. We have never held that because the person arrested is sought for drug trafficking, it is reasonable to suspect for that reason alone that there may be another person in the home who poses a danger to officer safety. And we do not see why such a conclusion is reasonable here, when Delgado was arrested in Puerto Rico on a New York warrant and the government points to no evidence of a link between Delgado's alleged drug dealing and the presence of confederates in Puerto Rico, let alone a link that would suggest any such local confederate would have been at Delgado's residence between 4:30 and 5:00 A.M.[6] See Archibald, 589 F.3d at 299 (noting that the particular arrest warrant at issue "did not raise concerns that an accomplice might be present in [the defendant's] apartment at the time of his arrest"); see also United States v. Moran Vargas, 376 F.3d 112, 116 (2d Cir. 2004) (rejecting the contention that "agents

---

[6] The lessee of the apartment adjoining Delgado's house testified that, on February 20, 2014, she was awoken between 4:30 a.m. and 5:00 a.m. by law enforcement's presence at the residence.

had a reasonable belief that other people might be in the motel room due to their suspicion that [the defendant] was a drug courier, their experience that drug couriers often meet up with their contacts, and their awareness that drug traffickers are frequently armed and dangerous" when "[n]o facts specific to this case support[ed] [such] a finding").

There were, to be sure, nearby residences, including an adjoining apartment. The government does not explain, however, why that fact bears on whether anyone besides Delgado who might pose a danger to officers was present in Delgado's home, even when considered in connection with the reason for Delgado's arrest. Nor is there any testimony that the "intel work" that had been performed prior to the execution of the arrest warrant suggested a reason to conclude that the adjoining apartment made it likely for a dangerous confederate of Delagdo's to be present.

As for the gate and rebar fence, neither is a particularly uncommon residential feature. Nor does the record suggest otherwise. We thus fail to see how either feature, even when considered along with the facts already mentioned, provides a basis for reasonably suspecting that someone besides Delgado was in the house who could pose a threat to the officers. See Archibald, 589 F.3d at 299-300 (explaining that the government's burden "is not reduced because the officers were unable to view the entire residence or because they felt 'particularly

-20-

vulnerable' based solely on their location," and that "if, as the officers testified, entry into a 'fatal funnel' poses a greater risk to law enforcement, the prudent course of action would have been to back away from the door, not proceed through it").

So too do the government's arguments fail with respect to the presence of security cameras on the premises. Security cameras may better allow a person within a residence to track officers' movements outside. But we fail to see how their presence provides officers a reason to believe that there is in fact someone else inside a residence. Nor does anything in the record indicate that there is any particular reason to believe that the presence of such cameras does indicate that someone besides the person arrested was likely to be in the home of the arrestee. Thus, the security cameras, even if considered in connection with the other residential features of the home and Delgado's ties to drug trafficking, fail to shed any light on the question, under Buie, whether "a reasonably prudent officer" was warranted "in believing that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene." 494 U.S. at 334.

The final point we are asked to consider is the government's argument that Delgado's immediate voluntary surrender on the porch allows officers to infer the presence of others lying in wait from inside the residence. But Buie allows a protective sweep based on "articulable facts which, taken together with the

-21-

rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 334 (emphasis added).

We decline to conclude that, under Buie, it is rational, on this record, to infer that Delgado's voluntary surrender outside his home supports a belief that confederates were lying inside in wait. And that is so even if we take account of the other facts the government identifies in assessing the significance of the voluntary surrender. An arrestee may surrender outside for any number of reasons, including a desire to be cooperative, a fear that officers will otherwise use physical force against him or his property, or a desire to prevent the officers from entering a residence and seeing possible contraband inside.

To be sure, we recognize that the experience of law enforcement officers is entitled to deference. See Martins, 413 F.3d at 150 n.4. But, nothing in the testimony of the two officers articulates why it was reasonable, in this case, to infer from Delgado's surrender on the porch that someone else must have been lying in wait inside his home. Neither officer indicated in their testimony that it was either unusual or suspicious that Delgado came downstairs and met the officer's outside the front of the house. To the contrary, the testimony reflects that the officers initially sought to break through the rebar fence but then stopped

and waited -- albeit while calling for him to hurry up -- once Delgado opened a window and told the officers that he was on his way and would open the door.

The government relies on Winston, 444 F.3d 115, to argue that Delgado's "voluntary surrender outside the home 'could lead a reasonable agent to believe that it was part of a scheme to lead the agents away from the [house] because others were hiding there waiting to escape or launch a surprise attack on the agents.'" (quoting Winston, 444 F.3d at 119).  But the facts of Winston do not support the assertion.

In that case, federal agents arrived at Winston's home to arrest him and saw his car in the driveway.  Id. at 117.  When the agents knocked on the door, Winston's girlfriend answered and denied knowing to whom the car belonged.  Id.  She suggested that the agents inquire next door.  Id.  The agents did so, but no one answered.  Approximately five minutes later, the agents knocked again at Winston's door.  Id.  This time, they pushed past the girlfriend into the house.  Id.  When they shouted Winston's name, he responded, "Up here."  Id.  The agents then found and arrested him at the top of a staircase.  Id.

We found that a protective sweep was reasonable.  But we did so because "the deceptive actions of Winston's girlfriend . . . gave any potential occupants inside the house five minutes to conceal themselves or prepare an ambush," and because Delgado's

"casual response inviting [the agents] upstairs was unusual," "given that Winston knew that agents had forcibly entered his house," and thus "could lead a reasonable agent to believe that [these actions were] part of a scheme to lead the agents away from the basement because others were hiding there waiting to escape or launch a surprise attack on the agents." Id.

The facts here are hardly comparable. Nor, as we have mentioned, does any testimony from officers on the scene support the government's assertion in its brief that Delgado's voluntary surrender outside the home was in its nature reasonably viewed as part of a scheme to lead the agents away from the house because others were preparing inside to launch a surprise attack on the agents.

In sum, there were not articulable facts -- even when considered as a whole -- supporting the presence of another individual in Delgado's residence.[7] To be sure, the government did not know for certain that no one else would be in Delgado's residence who might pose a danger. But "[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep." United States v. Colbert, 76 F.3d 773, 778

---

[7] We note also that an officer testified that a protective sweep of a residence is standard practice when making an arrest, at least, apparently in a case involving narcotics. That testimony hardly suffices to show that the sweep was based on specific articulable facts about safety concerns that existed at the time of the sweep.

(6th Cir. 1996).  For while "there could always be a dangerous person concealed within a structure[,] . . . that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in Buie."  United States v. Carter, 360 F.3d 1235, 1242-43 (10th Cir. 2004).[8]

## c.

Having found the protective sweep unlawful, we next must address Delgado's contention, raised only in his pro se supplemental brief, that all of the evidence that was recovered during and following the sweep -- and thus both the magazine recovered during the sweep itself and the loaded firearm that was recovered in a separate search of the dresser inside his home -- must be excluded as the fruit of the unlawful sweep.  We agree with Delgado on this point, too.

"[T]he indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality."  New York v. Harris,

---

[8] A finding that the protective sweep was unlawful is also reason to reject the government's argument that the admission of the firearm was, if erroneous, harmless error.  The government argues harmlessness on the ground that the magazine alone was sufficient to convict Delgado.  But it is undisputed that the magazine was recovered during the protective sweep, so a finding that the protective sweep was unlawful forecloses the government's harmlessness argument, given that the government raised no argument as to why the magazine would not then be a fruit of the unlawful protective sweep.

495 U.S. 14, 19 (1990). Or, put otherwise, "[t]he question whether evidence obtained after an illegal search should be suppressed" depends on whether "the evidence to which . . . objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" United States v. Finucan, 708 F.2d 838, 843 (1st Cir. 1983) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)) (ellipsis in original).

In considering whether the indirect fruits of an unlawful action by law enforcement should be suppressed, courts have considered several factors. The Supreme Court has noted that "[n]o single fact is dispositive," but that "temporal proximity," "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct" are all relevant to the taint inquiry. See Brown v. Illinois, 422 U.S. 590, 603-04 (1975). And, where, as here, an earlier unlawful search is alleged to have tainted consent that is given later, we have "emphasized the importance of determining whether the prior illegality 'significantly influenced' or 'played a significant role' in the subsequent consent." United States v. Cordero-Rosario, 786 F.3d 64, 76 (1st Cir. 2015).

Applying these principles, it is clear that our conclusion that the protective sweep was unlawful requires that the magazine found during that sweep be excluded from evidence, as

it is an unlawful fruit of the protective sweep.  In fact, the government does not even make an argument as to how the conclusion could be otherwise.

We also agree with Delgado that the loaded firearm, which was found during a search of a dresser in Delgado's home that followed the protective sweep, must be excluded.  Here, too, the government does not make any separate argument that the search of the dresser, which revealed the loaded firearm, was not tainted. Instead, the government merely contends that the search of the dresser that followed the unlawful sweep was consensual.  But that contention is beside the point.  For while it is true that, under our precedent, Delgado's voluntary response to Díaz-Vargas's question, in which Delgado said that there was a firearm in the dresser, would ordinarily suffice to allow officers to search the dresser, see United States v. Reynolds, 646 F.3d 63, 73 (1st Cir. 2011) ("It was reasonable for the district court to find that [the defendant's] gesture to the headboard when answering 'yes' to whether she had weapons demonstrated that [the defendant] understood the police officer intended not only to learn of the existence of the weapons, but also to find them."); see also Winston, 444 F.3d at 121, that voluntary response followed what we have now determined to be an unlawful protective sweep.

The question, then, is whether that consent was tainted by the unlawful protective sweep, such that the evidence turned up

in the search is an illegal fruit.  To answer that question, we must "determine whether the causal link between [the] prior unlawful search and consent (voluntary though it may have been) to [the] subsequent search is so tight that the evidence acquired pursuant to that consent must be suppressed."  Cordero-Rosario, 786 F.3d at 76 (citing United States vs. Navedo-Colón, 996 F.2d 1337, 1339 (1st Cir. 1993)).

Based on the record developed at the hearing below at which the question of the protective sweep's lawfulness was fully addressed, the causal link between the protective sweep and Delgado's consent to search the dresser is quite strong.  The record contains no indication that Díaz-Vargas or any other officer would have asked Delgado whether there were weapons in the residence -- and no evidence that Delgado would have voluntarily revealed the firearm's existence and location -- if not for the protective sweep which occurred mere minutes before Díaz-Vargas asked Delgado about possible weapons.  See Cordero-Rosario, 786 F.3d at 76.  And the government makes no argument as to why Delgado's consent was not the tainted fruit of the unlawful sweep.

The government does make two further arguments -- each, for the first time on appeal -- as to why the loaded firearm is admissible even if the protective sweep was unlawful.  But, even if we were to address those contentions despite their not having

-28-

been raised below, see United States v. Elwell, 984 F.2d 1289, 1298 (1st Cir. 1993), neither has merit.

The government first contends that we may affirm the suppression ruling on the ground that, in light of the Magistrate Judge's finding that Delgado later freely and voluntarily consented to a search of the full residence, the loaded firearm would have been inevitably discovered. The government thus argues that Delgado's consent to the full-residence search "cured any possible illegality in the earlier limited search of his dresser drawer during which officers retrieved the loaded firearm."

Under the inevitable discovery doctrine, however, "[t]he government bears the burden of showing, by reference to demonstrated historical facts and by a preponderance of the evidence, that the information or item would inevitably have been discovered by lawful means." United States v. Infante-Ruiz, 13 F.3d 498, 503 (1st Cir. 1994) (quotation marks and citation omitted). And, in evaluating whether the government has met this burden, we consider whether "the lawful means of [evidence's] discovery are independent and would necessarily have been employed" absent the earlier unlawful search, and whether "discovery by that [lawful] means is in fact inevitable." United States v. Zapata, 18 F.3d 971, 978 (1st Cir. 1994). We review the District Court's factual findings as they relate to inevitable discovery for clear error, and review legal conclusions as to the

inevitable discovery issue de novo.  <u>United States</u> v. <u>Almeida</u>, 434 F.3d 25, 27 (1st Cir. 2006).[9]

In applying the inevitable discovery doctrine to Delgado's case, we must consider whether the government has met its burden of showing that Delgado would inevitably have freely consented to a search of his home -- thereby resulting in the discovery of the magazine and the loaded firearm -- even if there had been no unlawful protective sweep.  But this burden is not one that the government has met.

The Magistrate Judge did find that Delgado cooperated with law enforcement throughout the encounter, a fact that perhaps lends some support to the view that Delgado may have consented to the search of the residence even if the protective sweep had not occurred.  But the Magistrate Judge did not find that Delgado would have freely consented to a search of his residence even if the earlier protective sweep had not occurred.  Nor did the government below attempt to make the case that Delgado would have done so.

---

[9] Neither the government nor Delgado discussed inevitable discovery in their filings below or at the suppression hearing. While this may suggest that remand would be appropriate with respect to the inevitable discovery issue, remand is not necessary here. The government does not ask for a remand in the event that we reach the inevitable discovery issue, and instead fully briefs it. As we have already noted, the burden of showing that the firearm would have inevitably been discovered, even without the unlawful protective sweep, rests with the government. <u>See</u> <u>Infante-Ruiz</u>, 13 F.3d at 503.

We reject the government's contention that the record sufficiently shows that Delgado's consent to the full-residence search was not significantly influenced by the fact that officers had already recovered the magazine. After all, he had already told officers that a firearm was in a dresser drawer in his residence, and had done so following a protective sweep during which the magazine was in plain view. Nothing in the record suggests Delgado was not aware that the magazine was in plain view during the protective sweep or that Delgado would have admitted to having a firearm regardless of that fact. As the search for the firearm in the dresser was tainted by the protective sweep in light of the magazine's presence in plain view, we do not see how Delgado's consent to do the full-residence search was not significantly influenced by the fact that Delgado knew the protective sweep had occurred.

In other words, the government's inevitable discovery argument rests on speculation about what Delgado would have done had the events of that day proceeded differently. But, the government cites no authority to support its view that we must credit such speculation, which we consider here even without a finding below accepting the government's view. Instead, the government cites only one case in its discussion of inevitable discovery for the proposition that the government can meet its burden based on speculation about how a suspect or defendant would

have acted had an earlier unlawful search not taken place. And that case is an out-of-circuit district court case with facts very different from this one. See United States v. Wai-Keung, 845 F. Supp. 1548, 1560-61 (S.D. Fla. 1994) (concluding that an individual would have consented to a search of his car even absent an allegedly unlawful search the previous day, given that the individual in fact consented while having no knowledge of the previous day's allegedly unlawful search). As a result, we find that the government has failed to carry its burden of showing that the discovery of the loaded firearm would have been inevitable, even absent the unlawful protective sweep. See Infante-Ruiz, 13 F.3d at 503.

The government's other never-before-raised argument as to why we must affirm the suppression ruling is that exigent circumstances justify the retrieval of the loaded firearm from the dresser. In so arguing, however, the government does not acknowledge that the officers' only source of knowledge about the firearm -- Delgado's statement of its existence and location -- was tainted by the unlawful protective sweep. And, in the only case that the government cites in support of its exigent circumstances argument, which featured the threat of a suspect detonating bombs located within a residence rather than a firearm in a dresser drawer in an apparently empty home, United States v. Lindsey, 877 F.2d 777 (9th Cir. 1989), the officers' knowledge of

the potentially exigent circumstance was not challenged as potentially tainted. As a result, we decline to adopt the government's exigent circumstances argument.

### III.

For these reasons, the District Court's denial of Delgado's motion to suppress is **reversed**, and the case is **remanded** to the District Court.