# United States Court of Appeals
## For the First Circuit

No. 16-2009

UNITED STATES,

Appellee,

v.

HECTOR SERRANO-ACEVEDO,

Defendant, Appellant.

No. 16-2049

UNITED STATES,

Appellee,

v.

VIRGILIO DIAZ-JIMENEZ,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

Rafael F. Castro Lang for appellant Hector Serrano-Acevedo.

James L. Sultan, with whom Kerry A. Haberlin and Rankin & Sultan were on brief, for appellant Virgilio Diaz-Jimenez.

Nicholas W. Cannon, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

———————————

June 13, 2018

———————————

**LYNCH**, **Circuit Judge**. We address in this case important questions of Fourth Amendment protections in a person's home. As we did in United States v. Delgado-Pérez, 867 F.3d 244 (1st Cir. 2017), we conclude that the government overstepped the mark and that a motion to suppress the fruits of a warrantless search of a defendant's home in Puerto Rico should have been granted.

Virgilio Diaz-Jimenez ("Diaz") and Hector Serrano-Acevedo ("Serrano"), after a joint trial, were found guilty of armed bank robbery, in violation of 18 U.S.C. § 2113, and possession of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924. Both defendants challenge their convictions, arguing that key portions of the evidence introduced against them were improperly admitted.

Diaz argues that the government's warrantless search of his home violated his Fourth Amendment rights and that the district court erred by denying his motion to suppress the evidence uncovered during that search. Finding that the government's search does not fit within the protective sweep or voluntary consent exceptions under Fourth Amendment doctrine, the only even arguably relevant exceptions to the warrant requirement, we hold that the search of Diaz's home was unconstitutional. The evidence uncovered during that search was central to the prosecution's case at trial, rendering this error prejudicial. We vacate Diaz's conviction and remand for further proceedings consistent with this opinion.

Serrano, the other defendant, argues that several testimonial statements made during the trial, some of which referenced statements made by a confidential informant who did not testify, were impermissible hearsay testimony. If there was any error, it was harmless, so we affirm Serrano's conviction.

## I. **Facts**

We review the district court's "legal conclusions involved in denying a motion to suppress the evidence de novo and its findings of fact for clear error." Delgado-Pérez, 867 F.3d at 250 (quoting United States v. Marshall, 348 F.3d 281, 284 (1st Cir. 2003)). "On a motion to suppress evidence seized on the basis of a warrantless search, the presumption favors the defendant, and it is the government's burden to demonstrate the legitimacy of the search." Id. (quoting United States v. Winston, 444 F.3d 115, 123-24 (1st Cir. 2006)).

Two armed men entered the Oriental Bank in San Lorenzo, Puerto Rico around 8:30 AM on June 17, 2013. The first gunman brandished his firearm and ordered the bank's security officer to "kneel down." The robbers told everyone in the bank to get on the ground. The second gunman then ordered the bank's employees to open the vault. After the bank employees turned over the money in

the vault area to the robbers, the gunmen left the bank and drove away in a white van.

The Puerto Rico Police Department provided a description of the van and its likely escape routes over the police radio. Officer Hector Ortíz-Alicia, hearing this, drove towards one of the possible escape routes. Once in the area, he saw a white van stopped by the side of the road. Ortíz-Alicia testified at trial that an armed individual got out of the van and, despite Ortíz-Alicia's orders to stop, fled into a grassy area nearby. Other testimony at the suppression hearing was that two people were seen leaving the van.

Ortíz-Alicia requested backup. Police searched the area with the help of a helicopter, but were unable to find the armed individual. The FBI and the Immigration and Customs Enforcement ("ICE") Task Force reported to the scene. Agent Aristedes Vázquez-Díaz from the ICE Task Force reported to Agent Félix Rivera from the FBI that he had been contacted by an informant who had information about the robbery.

Shortly thereafter and at a different place, Agent Rivera and one or more ICE Task Force officers met with a confidential source who provided the nicknames -- El Domi and El Músico -- and cell phone numbers of two people who the source said were responsible for the robbery. The source stated that he had been in contact with the two robbers since the robbery and that

the robbers were hiding in nearby mountainous terrain and were waiting for the police helicopter to leave. The source stated that the robbers were expecting the source to pick them up. Agent Rivera had been planning to use this information to arrest the robbers at the pickup point. However, around 1:00 or 1:30 PM, the robbers notified the source that they had left their hiding place and no longer needed to be picked up. This information was passed on to law enforcement.

Law enforcement officers contacted the phone company in order to track the location of the robbers' two cell phones. One of the cell phones eventually became stationary in a rural, residential area in Barrio Borinquen. Between 3:30 and 4:30 PM, law enforcement officers traveled to that location, stopping at a crossroads close to the three-story home where they had been told the cell phone was located. The home was large and had a pool and a fence. Suspecting that the robbers were armed, Agent Rivera called in a SWAT team.

As the law enforcement officers waited at the crossroads for a SWAT team to arrive before approaching the residence, defendant Serrano drove through the crossroads in a blue Mitsubishi Nativa. Agent Vázquez-Díaz and Agent Julio Sánchez-Martínez, also from the ICE Task Force, recognized Serrano as El Músico, the person who the confidential informant had said was one of the robbers. Vázquez-Díaz had seen Serrano driving a blue Mitsubishi

Nativa before. Sánchez-Martínez and Vázquez-Díaz gestured to Serrano to stop and blocked the Nativa's path with their patrol car.

The agents got out of the patrol car, approached Serrano's car, and saw a gun in it. The agents twice told Serrano not to reach for the gun, Serrano eventually complied, and the agents arrested him. Serrano admitted that the firearm was his. The agents recovered a dark hat and a black jacket from the vehicle. FBI agents later recovered a pair of blue and black Nike tennis shoes from inside the car and a bag full of cash hidden in the car's air filter. After the arrest of Serrano, the monitored cell phone was still located at the three-story house.

The evidence at the suppression hearing about what happened thereafter at the house was based on the testimony of the FBI agent in charge, Agent Rivera, who was not actually at the home initially. Around thirty minutes after Serrano's arrest, the SWAT time arrived at the crossroads near the large three-story home where the cell phone was said to be located. While Agent Rivera waited behind, the SWAT team approached the home, knocked on the door, and heard a toilet flushing and people talking inside the home. The SWAT team opened the door and called to the people inside the home, but remained outside. Diaz's wife came out of the home first and was detained, and Diaz came out shortly thereafter. Diaz was immediately arrested and was at some point

handcuffed (the record does not reveal whether Diaz's wife was also handcuffed). SWAT team then, after Diaz was arrested outside, entered and did a sweep of the home.

During this sweep, the SWAT team "went to different places, and they saw money on top of the bed, they saw money inside the toilet." After the SWAT team had come outside following the search, they reported what they had seen to Agent Rivera, who by then had arrived. Agent Rivera then asked for Diaz's consent to conduct a search of his home. Diaz was arrested and in handcuffs at the time. Agent Rivera testified that Diaz consented verbally but refused to sign a form to that effect. The FBI then did a subsequent search of the house and recovered around $24,000 in cash and a box for a pistol. Diaz's wife consented to the search after it had occurred, and did so in writing. The cash found was bound with initialed bands, and bank tellers at the Oriental Bank later confirmed that their initials were on the bands.

Diaz filed a motion to suppress the evidence recovered during the warrantless search of his home. The magistrate judge held a hearing on the motion. Agent Rivera was the prosecution's only witness at that hearing. Agent Rivera did not testify that he was the one who ordered the SWAT team to perform the sweep, but he provided reasons for why he believed the search was justified. The prosecution primarily argued that the search was permissible because the officers were in "hot pursuit" of Diaz at the time.

It did not even attempt to justify the search as a protective sweep meant to protect the safety of the officers.

Diaz, in opposition, argued that there was no "hot pursuit" because the SWAT team's search was conducted more than eight hours after the robbery and, further, he had already been placed under arrest before the sweep. The magistrate judge recommended that the district court deny Diaz's motion, based on acceptance of the prosecution's hot pursuit theory. The district court adopted that recommendation.

Evidence obtained during the search of Diaz's home was used at trial by the prosecution. A jury found Diaz and Serrano guilty of armed bank robbery and use of a firearm in the commission of a federal felony. Diaz was sentenced to 192 months' imprisonment and five years' supervised release. Serrano was sentenced to 180 months' imprisonment and five years' supervised release.

## II. **Merits**

A. Diaz

Diaz challenges the district court's denial of his motion to suppress the evidence recovered from his home, arguing that the search violated his Fourth Amendment rights and that the admission of the evidence recovered in that search was prejudicial. The prosecution, on appeal, attempts to justify the search under the protective sweep doctrine. We bypass the issue of whether the

prosecution waived its protective sweep exception argument because the argument fails on its merits.

The Fourth Amendment forbids unreasonable searches and seizures, and a search of an individual's home "is generally not reasonable without a warrant issued on probable cause." Maryland v. Buie, 494 U.S. 325, 331 (1990). One exception to this rule is "a protective sweep conducted in conjunction with the arrest of an individual in his home."[1] Winston, 444 F.3d at 118 (citing Buie, 494 U.S. at 327). "A protective sweep is 'a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.'" Delgado-Pérez, 867 F.3d at 251 (quoting Buie, 494 U.S. at 327). In order for a warrantless search to be a protective sweep, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Buie, 494 U.S. at 334.

The prosecution argues that the search of Diaz's home was permissible because the officers had reason to believe that a person involved in the robbery was inside Diaz's home when they arrived and had remained inside the home both after the SWAT team

---

[1] The government does not defend its hot pursuit theory on appeal.

- 10 -

breached the door and ordered everyone out and after Diaz and his wife had come outside and Diaz had been arrested. As Serrano and Diaz had already been detained at the time of the sweep and could not possibly have posed a threat, the government's argument depends on there being "articulable facts" supporting a reasonable inference that, at the time of the sweep, there was a third bank robber in the house who was armed and remained inside Diaz's home despite Diaz and his wife having come outside and been apprehended. Id.

The government does not provide any facts supporting its theory that a third person remained in the house after Diaz and his wife came out. Nor does it attempt to explain why it could not have gotten a warrant before entering the house. Agent Rivera admitted that they had received no information suggesting the existence of a third participant in the bank robbery. Indeed, the evidence known to the officers then was that there were two people who robbed the bank and then got away. Two people were seen getting into a van at the scene of the crime. An informant had told authorities that "two individuals known to him . . . were responsible for this bank robbery." (emphasis added). Agent Rivera stated at the suppression hearing that the information law enforcement had was that two people had been spotted parking the van by the side of the road several hours after the robbery and fleeing into the surrounding woods. Law enforcement had arrested

- 11 -

Serrano during a traffic stop and Diaz at his home shortly thereafter. That accounts for the two people seen during the robbery and leaving in the van, and abandoning the van later. This alone undercuts the theory that there was a third person in Diaz's house. Even if there had been a third robbery participant in the van when it left the bank, he had separated from Diaz and Serrano before the van stopped. There was no articulable basis to believe that he would be in Diaz's home.

Agent Rivera testified that because "as soon as the [two] individuals left [the bank], they went inside the van and left the location," he simply "assumed that there was a third waiting for them in the van." (emphasis added). This assumption was based on unfounded speculation, not "articulable facts" in the record. Delgado-Pérez, 867 F.3d at 251.

At oral argument, defense counsel asserted that "protective" sweeps are done as a "standard practice" in Puerto Rico regardless of the circumstances and that that may be what happened here. Neither explanation satisfies the constitutional requirements.

We reverse the district court's ruling denying Diaz's motion to suppress. The physical evidence recovered during the sweep, including the money from the bank, must be excluded as "unlawful fruit of the protective sweep." Id. at 257.

That does not end the matter. The prosecution argues that, even if the sweep was impermissible, Diaz's later consent to a search of his home -- while he was outside the home, under arrest, and in handcuffs and after the SWAT team had entered his home -- independently led to a constitutional search that recovered additional money inside Diaz's home.[2] Given that the consent followed an illegal search, the evidence recovered in the consent search should still be suppressed if it "bear[s] a sufficiently close relationship to the underlying illegality."[3] Delgado-Pérez, 867 F.3d at 256 (quoting New York v. Harris, 495 U.S. 14, 19 (1990)). This inquiry looks to factors including "temporal proximity, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct." Id. at 257 (internal quotation marks omitted) (quoting Brown v. Illinois, 422 U.S. 590, 603-04 (1975)).

As a matter of law, once the search has been found illegal and a causal connection is evident, the government bears the burden of showing that Diaz's consent was sufficiently

---

[2]     The district court found that Diaz's wife's consent did not justify the warrantless search because she provided it after the second search had already begun. The government does not challenge that finding on appeal.

[3]     Because we hold that Diaz's consent to the second search was tainted by the illegality of the SWAT team's sweep, we need not decide whether Diaz's consent was "knowingly, intelligently, and voluntarily given." United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003).

- 13 -

attenuated from the illegal search.  See United States v. Kornegay, 410 F.3d 89, 94 n.3 (1st Cir. 2005).  The prosecution did not even attempt to make such a showing.  Agent Rivera sought and received consent immediately after the SWAT team told him that they saw money in the house during the "protective" sweep and once Diaz was already in handcuffs.  The record provides no indication that Diaz would have consented to the search if not for the unconstitutional sweep and what it uncovered.  In response to this strong factual connection, the government "makes no argument as to why [Diaz's] consent was not the tainted fruit of the unlawful sweep." Delgado-Pérez, 867 F.3d at 258.

Undaunted, the government next argues that any error is harmless because the "remaining evidence introduced at trial," including Diaz's former cellmate's testimony that Diaz made a jailhouse admission to his cellmate that he acted as a lookout during the robbery and the cell-site data showing the phone was located near the location of the robbery and in Diaz's home, "established that he participated in the robbery."  Given the constitutional error in this case, we must remand for a new trial unless the error was "harmless beyond a reasonable doubt." United States v. Leon-Delfis, 203 F.3d 103, 112 (1st Cir. 2000) (quoting Milton v. Wainwright, 407 U.S. 371, 372 (1972)).

The evidence recovered from Diaz's home was central to the government's case, so the error was certainly not harmless

- 14 -

beyond a reasonable doubt. See id. (concluding that the admission of "highly probative" evidence "likely to be at the center of a jury's attention," which was obtained in violation of the defendant's constitutional rights and which should have been suppressed at trial, was not harmless beyond a reasonable doubt). The bands around the cash found in Diaz's home, which were initialed and later identified by Oriental Bank employees, directly linked Diaz to the robbery. The government referenced this evidence repeatedly throughout closing argument. The pistol case recovered from Diaz's home was also used to connect him to the robbery.

The government's other evidence of guilt is weak in comparison. Roberto Capo-Ortiz, Diaz's former cellmate, testified that Diaz admitted to him that he acted as a lookout during the robbery. There was no purported admission that Diaz was one of the robbers. Diaz argues that Capo-Ortiz's testimony was self-interested and untrustworthy. Indeed, Capo-Ortiz is a convicted felon who testified in this case in the hope of having his twelve-year sentence reduced. The prosecution's cell-site evidence places cell phones registered to Diaz near the bank, in the woods near where the van was abandoned, and finally near his home. While that is relevant evidence, it is not so strong as to make a guilty verdict so likely as to render the admission of the evidence recovered from Diaz's home harmless. Given the centrality of the

money to the government's case at trial, we cannot find that the error was harmless beyond a reasonable doubt.

B.  Serrano

Serrano's only argument[4] is that several testimonial statements made by Agent Sánchez-Martínez and Agent Vázquez-Díaz were improper hearsay.  The most potentially damaging statement -- Vázquez-Díaz's testimony that an informant told him the names of the robbers -- was stricken from the record and was subject to a curative jury instruction.  Serrano never requested more regarding the statement, so our review is for plain error.  United States v. Colón-Díaz, 521 F.3d 29, 33 (1st Cir. 2008).  "When a witness strays into forbidden territory, . . . strik[ing] the wayward remark and instruct[ing] the jury to disregard it" will usually "suffice to safeguard the aggrieved party's rights."  United States v. Lee, 317 F.3d 26, 35 (1st Cir. 2003).  Serrano, who falsely claims that this statement was admitted into evidence, provides no credible reason why the district court's remedy was plainly erroneous.

Serrano also challenges the admission of testimony from Roberto Capo-Ortiz that Diaz told Capo-Ortiz that Diaz and Serrano committed the robbery.  Serrano argues that this is inadmissible

---

[4]    Serrano does not argue that, if the Diaz verdict is vacated, his must be as well, and we see no basis for such an argument.

hearsay because Diaz's statement was not self-inculpatory under Federal Rule of Evidence 804(b)(3). Yet Capo-Ortiz later testified that Serrano himself confessed. This means that Diaz's alleged statement to Capo-Ortiz that Serrano had participated in the robbery added little to the prosecution's case, making the admission of that statement from Diaz harmless. See United States v. Perkins, 926 F.2d 1271, 1280 (1st Cir. 1991) (citing United States v. Benavente-Gomez, 921 F.2d 378, 386 (1st Cir. 1990)).

We need not address whether the remaining statements were hearsay because any error was harmless. "The admission of improper testimony is harmless if it is 'highly probable that the error did not influence the verdict.'" United States v. Flores-De-Jesús, 569 F.3d 8, 27 (1st Cir. 2009) (quoting United States v. Casas, 356 F.3d 104, 121 (1st Cir. 2004)). The evidence against Serrano was overwhelming. He was arrested with a bag full of cash hidden in his car. His car contained a pair of black and blue Nike tennis shoes, and a witness at trial described the robber as wearing "Nike black and blue shoes." His car also contained a handgun. Given the strength of this and other evidence, it is

highly probable that the alleged errors Serrano identifies did not affect the outcome of the trial.

## III.  Conclusion

We vacate Diaz's conviction and remand for further proceedings consistent with this opinion.  We affirm Serrano's conviction.